## MORGAN v. EASTERN TRANSP. CO.

District Court, E. D. Virginia. January 27, 1928.

J. L. Morewitz, of Newport News, Va. (Jesse L. Rosenberg, of New York City, on the brief), for libelant.

George M. Lanning, of Norfolk, Va. (Baird, White & Lanning, of Norfolk, Va., on the brief), for respondent.

GRONER, District Judge. The original libel in this case, filed October 29, 1927, was brought to recover expenses incurred for "maintenance and cure," and likewise to recover wages and in addition two days' pay for each day unpaid, under section 4529, R. S. (46 USCA § 596). Subsequently (November 18) an amended libel was filed, alleging in addition permanent injury, and asking for damages in the sum of $5,000 on this account. The suit is instituted under that provision of the Revised Statutes which allows a seaman to sue without security or prepayment of costs. The matter has been submitted to me on depositions and on a written stipulation.

The right of the libelant to recover additional compensation on account of the alleged

refusal of the respondent to pay his earned wages when demanded, as provided in section 4529, R. S., is the principal point in the case, and the determination of this right depends wholly upon the view taken of the contradictory evidence as to the circumstances under which libelant left the vessel. I have read all of the depositions carefully, and the two versions of this incident may be, I think, summarized as follows:

On behalf of the libelant: That he joined the sea-going tug T. J. Hooper, belonging to the respondent, at Norfolk on or about the 27th–28th of November, 1926, as fireman, at wages of $75 a month and maintenance. That he performed satisfactorily the duties of his position until the early part of December, 1926, while the tug was proceeding from New York to Providence, when in the performance of his duties he was thrown on the floor of the fireroom by the roll of the tug in a heavy sea, and was burned on his body by contact with a hot slice bar, which he was then using on the fires, and that by reason of this injury he was temporarily unable to perform his duties, and remained in the forecastle for at least a day and a night. That, while he was so incapacitated, the assistant engineer ordered him out and to work, and abused him soundly for refusal to turn to. That upon his return to work he suffered pains in his back from time to time, but continued to perform his duties until the return of the tug from Providence and Boston to New York, which latter port was reached on or about December 12th. On December 14th, and just a little while before the tug was scheduled to leave en route to Norfolk, libelant went to bridge, and according to his statement on direct evidence asked the captain for a hospital slip and for his time, stating to the captain that he "had got hurt and wanted to go to a hospital," but on cross-examination, in relating the same occurrence, said that he asked the captain to make up his time and give him a hospital slip, but that he neither told him that he had been sick or had been hurt. That the captain declined to do anything himself, but sent him to the chief engineer. That he went to the chief engineer and asked him to make up his time and give him a hospital slip, "because I am hurt and want to go to the hospital." That the chief engineer likewise refused, whereupon he went to the forecastle, got his clothes, again went to chief engineer, and asked for his wages earned prior to the 1st of December, which were refused, whereupon he left the vessel.

The respondent's version of this incident, supported by the testimony of the master, the chief engineer, and the assistant engineer, differs very materially from that of the libelant. All three agree that libelant was employed as fireman and commenced to work 6 a. m. November 28th, while the tug was still tied up to the pier at Norfolk. That a few days later, while the tug was en route to New York, libelant notified the assistant engineer that he was sick and wished to be paid off in New York, and asked that he be given a hospital certificate. The assistant engineer reported this to the chief engineer, who made up libelant's time and passed it on to the captain, who, on arrival of the vessel at New York, tendered him his wages, which libelant refused to accept, stating that he had signed on at Norfolk, and intended to return to Norfolk on the boat, and that he would only leave on condition of receiving 30 days' pay and his transportation back to Norfolk. That, upon libelant's refusal to accept his pay, the captain told him to return to his work, which he did, and continued to work on the trip to New York, Providence, and Boston, and returning to New York. That the weather was not bad during any part of the trip, and that libelant made no report of injury then or at any other time. That the tug reached New York in the afternoon of the 12th of December, and after coaling lay at the dock until 12 noon of the 14th, when, just on the eve of casting off, libelant came to the upper deck of the tug and damanded his wages. The captain replied that he was entitled to 24 hours' notice under the articles, and libelant replied: "I don't intend to stay on this boat. I am sick." That the captain asked him what was the matter, and he replied: "You can't do anything for me, and there is no use in my telling you. I am not going to stay on the boat." That the captain explained to him that he had some medicines aboard, and he would be glad to give him anything of this kind that he had, but that libelant refused to discuss the matter further, left the deck, got his clothes, and, just before the vessel sailed, went ashore. All three officers deny that libelant sustained any injury on board the vessel at any time, and libelant himself admits never to have reported his alleged injury on the way from New York to Providence, or at any other time, to either the chief engineer or the captain. He claims, however, that the assistant engineer knew of it.

The chief engineer's statement of what occurred between libelant and himself on the 14th, as the tug was leaving New York, is

to the effect that libelant came to him and asked for his time, and he asked him what the trouble was, and libelant replied: "nothing," except that he wanted to get off. That the chief engineer replied: "I am not going to give you any time. When we were in New York on our way up, you were offered your wages, and you refused to accept them on the ground that you had not had notice. Now you have given me no notice, and I will not make up your time"—and sent him to the captain. That he made no complaint of feeling sick, or of being injured, and he was not seen by the chief engineer after that time. All three of the officers and several members of the crew testified to a fight which libelant had with another fireman on the day before or the day of the arrival of the tug in New York on her return from Providence-Boston, and in which the combatants were separated by the assistant engineer. It is not disputed that, on the arrival of the tug at Norfolk three days after libelant left the vessel at New York, the master delivered the full amount of his wages to the United States shipping commissioner in the form of a draft on his owners, with a receipt and release to be signed by libelant when the same was paid to him.

Section 4529 of the Revised Statutes provides: "The master or owner of any vessel making coasting voyages shall pay to every seaman his wages within two days after the termination of the agreement under which he was shipped, or at the time such seaman is discharged, whichever first happens. * * * Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any claim made before the court."

This statute is frequently invoked and has been frequently construed. I have examined carefully the cases decided in this circuit, as well as those decided in other circuits, and I think there is nothing in the statute which would make it applicable in a case like this, if the testimony on behalf of the ship be true, for it will be readily seen from what has been said that the demand for his wages by libelant was made within a few minutes of the time the ship was leaving the port on a coasting voyage to Norfolk. It was made in complete disregard of the obligation of the seaman under the articles, and, whether the articles be binding or not,

as to which there is some controversy, it would have involved a delay of the tug until the captain could have obtained the money, if he happened then not to be in possession of funds sufficient for that purpose, or in obtaining another fireman to complete his crew.

I am constrained to believe that Congress, in the passage of the act and of all other similar acts, though primarily for the benefit of seamen, did not intend to establish an altogether one-sided standard of conduct, but rather to impose a reciprocal duty of good faith. If, therefore, without proper cause and in violation of an agreement of service, and without sufficient notice to enable the master of a vessel either to sail on schedule or to provide his vessel with a regular crew, a seaman demands his wages and upon refusal leaves the vessel, he may certainly not complain if the amount due him is momentarily withheld, and is paid at the first opportunity thereafter, and, as in this instance, in a few days, to the person delegated by Congress to receive the wages of seamen under such circumstances. Indeed, I think it can hardly be denied, if the articles were binding, that the refusal to work and abandonment of the ship, if proved, as is contended by the respondent, made a case in which libelant might properly have been logged as a deserter and forfeited his entire wages. I proceed, therefore, to examine the evidence to determine as to its greater weight.

Charles Burrell, a colored man who was an oiler on the tug Hooper during the entire period of libelant's service, who messed and slept in the same room with him, has testified that, although he was employed in the same department of the vessel as libelant, he never heard him complain of being burned or injured on the tug. Martin Chandler, another colored man, who, like libelant, was a fireman on the tug during the entire period in controversy, who slept in the forecastle with him, messed with him, and saw him necessarily throughout the entire voyage from Norfolk to New York, Boston, and Providence, and return to New York, likewise testified that he never heard of his being injured, or heard him complain of being injured; and the three officers, master, chief, and assistant engineer, all testified to the same effect. In addition to all of this, libelant himself admits that, in spite of his injury and in spite of the abusive treatment of the assistant engineer, he never reported to the chief engineer or to the master that he had sustained any injury.

As against this evidence is the statement

of libelant himself that he was injured, plus the statement of a Dr. Gershenson that, on December 20th, he examined libelant and found a contusion on his head and a burn on his abdomen, and the record of the Bellvue Hospital, showing that he was admitted to the hospital on the 14th of December and discharged on the 18th, with a diagnosis of "contusions of back," and that his examination there showed a healed wound of the scalp and the scar of a burn on his body. The evidence of the doctor and the record of the hospital would be more persuasive, if the evidence in either case had gone to the extent of showing that the scar from the burn on the stomach was sufficiently recent in appearance to indicate that the injury had been sustained during the half month, preceding. In the absence of any evidence as to this, it may reasonably be said to be equally consistent with an injury sustained prior to libelant's service on the tug. In addition to this, libelant's own admission that he never at any time reported his injury to the chief engineer, who employed him, and who was in daily contact with him, or to the master of the vessel, or to any of his shipmates, or requested medicine or ointments or salve at any time while aboard the vessel, or mentioned his injury when he was demanding his wages and refusing to stay on the vessel, is very strongly persuasive of the untruth of his statement that he sustained an injury.

But, if this were all, I should have great difficulty in reaching a conclusion as to the truth of this part of the story. Libelant, however, in order to sustain the claim of permanent injury made in his amended libel, testified further, with regard to his alleged injury, that after he had left the hospital in New York he went to his home in Philadelphia, and that since then, or in the intervening 11 months, he had only worked 5 days by reason of his disability; that during this entire time he had been taken care of by an insurance company; that he had employed a doctor, who charged him $2 for each visit, and who had visited him twice a week for 3 or 4 months; and that in addition to this he had paid considerable sums each week for medicine or in getting cured on account of the injury sustained on the tug. All of this is directly contradicted by the physician and the insurance company. The doctor's testimony, it was stipulated, is that he saw libelant for the first time on September 18, 1927, less than 2 months from the time he gave his testimony in this case, and more than 10 months from the time he left the vessel, and that the doctor treated him for pleurisy and bronchitis, and that no mention was made by the libelant to the doctor of any injury sustained in December, 1926, while working on the tug, and the record of the insurance company is that it paid him at the rate of $20 a week for 2 weeks from October 4, 1927, for disability occurring as a result of pleurisy.

The testimony of libelant and the facts as developed from the doctor and the hospital are utterly irreconcilable. The evidence given by him, as I have stated, was to the effect that he had done no work for approximately a year by reason of the injury sustained on the tug; that, in that period of time, his daily expenses for the maintenance of himself and family were $10; that these had been discharged principally through payments from an insurance company in which he was insured, and that for his injury he had been treated and attended by a doctor to whom he had paid $2 a visit for at least two visits a week for a period of 3 or 4 months. This evidence was offered in support of his claim of permanent injury on the tug. Since it was shown to be wholly untrue, it is not, I think, unreasonable that I should, especially in view of the statements of the other members of the crew, likewise regard his testimony that he was injured on the tug, and in these circumstances, it would leave him without any justification or excuse for his refusal to comply with his contract and continue with the tug to Norfolk, and therefore make, in my opinion, his eleventh-hour demand for a discharge unreasonable, and the deposit by the master of the boat of his wages on the arrival of the boat at Norfolk as entirely reasonable.

And in this respect, I think I may say, that the learned and industrious counsel for libelant agrees, for he does not ask for the application of the penalty, except from the date of the institution of the libel, or nearly a year after the incident in New York. He has not taken the position in the argument before me that the deposit made by the master with the shipping commissioner was not a compliance with the master's obligation in the premises, but that the insistence by the master of a release in full was unauthorized, and hence amounted to no tender of payment at all. I cannot logically follow this argument, for it would seem to be perfectly clear that, if the deposit by the master of the tug of the full amount of the earned wages of a recalcitrant seaman was a complete discharge of his entire obligation to that seaman, there arose out of the tender and acceptance a

corresponding obligation on the seaman's part to give the master a complete acquittal.

■ It should be said, however, in relation to what has just been stated above, that counsel for libelant does insist that the form in which the deposit was made was not a compliance with the obligation of the vessel, because it was not in cash, but in the form of a draft on the owners. Of course, it will not be disputed that a draft is not legal tender, and, if the refusal to accept the draft had been put on this ground in the first instance, there might be something in the claim for "waiting time" between the demand and the payment of cash, but it is evident to me that this position is an afterthought. No demand was made on the owners of the vessel or on the master from the time the deposit of the drafts was made in December, 1926, and the filing of the libel, October 29, 1927. Within 2 or 3 days thereafter counsel for libelant was notified that the drafts were in the possession of the shipping commissioner and would be delivered and cashed, and still a few days later that money would be substituted, if the drafts themselves were not acceptable, and at the partial hearing November 19th, the day after the amended libel was filed, counsel for the respondent offered to deposit the money in court, and this was done on November 24th, together with interest and costs then accrued. The home office of the respondent is not in Norfolk, but in New York. The witnesses were not here when the libel was filed. Some investigation was necessary, and everything, it seems to me, that was fair and reasonable in the circumstances as they exist in this case, was done to expedite the payment to libelant of all that he could possibly legally demand.

■ To penalize the respondent under such circumstances, even granting that libelant has a legal claim to his wages, which I think is not without serious doubt, would be, I think, wholly inequitable. In view of the fact that nearly 11 months had elapsed between the severance of relations between libelant and the vessel, and in view of the conditions of severance as I have related them, the least that libelant could do was to make demand for his wages on the master or the owner of the tug. If he had made such demand, and it had been refused, a wholly different case would have resulted. Instead, he filed a libel, and although within a very short time thereafter, and in my opinion in a reasonable time, was advised of the willingness of respondent to pay, he declined to accept the amount legally due, but insisted upon waiting time or penalty, and the payment of maintenance and care, for which he has been able to produce no evidence, and for damages for personal injury, which he has been unable to sustain.

This is not a case, in my opinion, in which section 4529 will apply, and there is no proof of anything being expended in maintenance and cure, and likewise no proof of any personal injury, nor proof or claim of unseaworthiness of the vessel.

I think, in fairness, a decree covering only the amount on deposit should pass in favor of libelant.